**IN THE UNITED STATES DISTRICT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MEANITH HUON,** ) | |
| **Plaintiff,** ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) | |
| ) | **JURY TRIAL DEMANDED** |
| ) | |
| **FORMER MADISON COUNTY STATE'S** ) | |
| **ATTORNEY WILLIAM MUDGE,** ) | |
| **MADISON COUNTY STATE'S** ) | |
| **ATTORNEY THOMAS GIBBONS,** ) | |
| **ASSISTANT STATE'S ATTORNEY** ) | |
| **CHRIS HOELL, ASSISTANT STATE'S** ) | |
| **ATTORNEY AMY CHAPMAN,** ) | |
| **MADISON COUNTY STATE'S** ) | |
| **ATTORNEY'S OFFICE,** ) | |
| **DETECTIVE WILLIAM MARCONI,** ) | |
| **DETECTIVE DAVID VUCICH,** ) | |
| **CAPTAIN BRAD WELLS,** ) | |
| **MADISON COUNTY SHERIFF** ) | |
| **ROBERT HERTZ,** ) | |
| **MADISON COUNTY SHERIFF** ) | |
| **DEPARTMENT,** ) | |
| **MADISON COUNTY,** ) | |
| **CHICAGO POLICE OFFICER BRIAN** ) | |
| **MCKENDRY, CHICAGO POLICE** ) | |
| **DEPARTMENT,** ) | |
| **CITY OF CHICAGO.** ) | |
| ) | |

**COMPLAINT**

Plaintiff, Meanith Huon, complaining of the Defendants, states as follows:

**CAUSE OF ACTION**

1.      This action is brought pursuant to 42 U.S.C. §1983, 42 U.S.C. §1985, the U.S. Constitution, the Laws of the State of Illinois and the Illinois Constitution, et seq. to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and the Illinois Constitution.

1

2.      Specifically, as a result of egregious misconduct by law enforcement and prosecutors, Plaintiff, Meanith Huon, was wrongfully arrested and prosecuted for alleged evil crimes that he did not commit.

3.      Defendants, William Mudge and the Madison County State's Attorney's Office, as a matter of official policy and practice, wrongfully concealed exculpatory evidence, made false statements, deprived Mr. Huon of his constitutional rights, and maliciously prosecuted Mr. Huon in violation of his rights under the Constitution of the United States and the constitutional and statutory authorities of the law of the State of Illinois.

4.      In 2008, Mr. Huon was charged with two counts of sexual assault, two counts of sexual abuse, one count of unlawful restraint.   The complaining witness, Jane Doe, alleged that while Mr. Huon was driving on Interstate 55 at highway speeds, he "yelled" to her to "suck his dick" and that she allegedly performed oral sex while he continued to drive.   There are no other allegations of force or threat of force.

5.      Rather than focusing on the facts in the allegation, as a matter of official policy and practice, the Madison County Sheriff Department and the Madison County State's Attorney's Office engaged in an illegal wiretap of Mr. Huon's cell phone.   As a matter of official policy and practice, the Madison County Sheriff Department and the Madison County State's Attorney's Office, submitted false affidavit to obtain a search warrant of Mr. Huon's computers located at his home in Chicago 300 miles away from the alleged crime scene, to engage in a fishing expedition for damaging and embarrassing but non-relevant information.

6.      As a matter of official policy and practice, the Madison County Sheriff Department and the Madison County State's Attorney's Office released press release replete with false statements, in an effort to bias potential jurors.   When Mr. Huon attempted to correct the defamatory and false statements being published, the Madison County State's Attorney's Office contacted Mr. Huon's attorney and threatened additional felony charges.

7.      As a   matter of official policy and practice, the Madison County State's Attorney's Office over-charged Mr. Huon in an effort to pressure him into accepting a plea of conviction.   Mr. Huon was originally charged with five counts of felony charges, three of which were voluntarily dismissed at trial by the State.

8.      As a matter of official policy and practice, the Madison County Sheriff Department and the Madison County State's Attorney's Office engaged in retaliatory arrest and prosecution, after Mr. Huon exercised his right to a jury trial.    After Mr. Huon refused to accept a plea of conviction in the 2008 case, the   Madison County Sheriff Department and the Madison County State's Attorney's Office submitted a false affidavit and verified application to revoke Mr. Huon's bond in the 2008 case and issue an arrest warrant for new felony charges in 2009.

9.       In 2009, the same complaining witness, Jane Doe, Googles "Meanith Huon" and finds a private blog containing daily musings on God with no reference to Jane Doe's legal name.   The State charged Mr. Huon with cyberstalking.    For the alleged crime of Jane Doe

2

Googling "Meanith Huon" and cyberstalking Mr Huon online, the State charged Mr. Huon with cyberstalking.

10.     As a matter of official policy and practice, the Madison County Sheriff Department and the Madison County State's Attorney's Office engaged in false arrest and prosecutorial misconduct in other cases.    Before Mr. Huon's trial, in July of 2008, Cody Liley, was interrogated by the same detective, Defendant, Vucich, and he was convicted of sexual assault and sentenced to 10 years in prison.   Mr. Liley's conviction was overturned by the Fifth District Illinois Appellate Court in a Rule 23 unpublished opinion on October 21, 2010, No. 5-08-0636.      After Mr. Huon's trial, on May 20, 2010, a Madison County jury acquitted Dylan Brent Whitlock of sexual assault.   The same prosecution team, Defendants Chris Hoell and Amy Chapman, prosecuted the Whitlock case.

11.     As a matter of official policy and practice, the Madison County Sheriff Department and the Madison County State's Attorney's Office engaged in false arrest and prosecutorial misconduct by targeting minorities and people of color.      The 2009 charges involved the issues of Free Speech under the First Amendments, since Mr. Huon was accused of writing about God in a blog.   While Mr. Huon's charges in the 2009 case was pending, the Madison County Sheriff Department and the Madison County State's Attorney's Office charged a Olutosin O. Oduwole, Southern Illinois University college student, with making a terrorist threat.   The alleged terrorist threat consisted of rap lyrics had been found on a piece of paper that later was found in Mr. Oduwole's car.

12.     The false arrest and prosecution of Mr. Huon was motivated by political reasons. Defendants William Mudge was planning to run for elected office as judge.   After Mr. Huon was acquitted in the 2008 charges, the Madison County State's Attorney's Office did not set the 2009 case for trial for more than 160 days.    Mr. Huon's remaining charges in the 2009 case was dismissed on or about the same day as when   Defendant Mudge was sworn into elected office as a state judge.   The timing is evidence that the arrest and prosecution of Mr. Huon was driven by the potential political embarrassment of losing a high profile case in an election year.

13.     As a further result of the egregious misconduct by law enforcement and prosecutors, Plaintiff, Meanith Huon was permanently and severely injured.

14.     Defendants William Mudge, Amy Chapman, Chris Hoell, and the Madison County State's Attorney's Office, as a matter of official policy and practice, violated Plaintiff, Meanith Huon's, constitutional and maliciously prosecuted Mr. Huon in violation of his rights under the Constitution of the United States and the constitutional and statutory authorities of the law of the State of Illinois.

15.     Defendants Robert Hertz, Brad Wells, David Vucich, William Marconi, and the Madison County Sheriff's Office, as a matter of official policy and practice, violated Plaintiff, Meanith Huon's, constitutional and maliciously prosecuted Mr. Huon in violation of his rights under the Constitution of the United States and the constitutional and statutory authorities of the law of the State of Illinois.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343(a); the Constitution of the United States; and supplemental jurisdiction as codified in 28 U.S.C. §1367(a).

17.     Venue is proper pursuant to 28 U.S.C. §1391 (b).   Defendants, City of Chicago and Chicago Police Department reside in the judicial district.   On information and belief, Chicago Police Officer Brian McKendry resides in the judicial district.   A substantial part of the events or omissions giving rise to the claim occurred within the district.   Mr. Huon was arrested and detained in the City of Chicago, in this judicial district.    The execution of the search warrants and search of Mr. Huon's apartment and computers took place in this judicial district, 300 miles from where the alleged crime took place.

## THE PARTIES

18.     Plaintiff, Meanith Huon (hereinafter referred to as "Mr. Huon"), was at all relevant times a citizen of the United States and a resident of Cook County, Illinois.

19.     Defendant, William Mudge (hereinafter referred to as "Defendant Mudge"), was the Madison County State's Attorney, and is sued in his individual and official capacities.   At all times relevant to this Complaint, Defendant Mudge was a final policymaker responsible for his own actions and the actions of his subordinate employees of the Madison County State's Attorney's Attorney's Office, and was acting in an administrative capacity with respect to certain matters alleged herein.

20.     Defendant, Thomas Gibbons   (hereinafter referred to as "Defendant Gibbons") is the current Madison County State's Attorney.   Defendant Gibbons is being sued solely in his official capacity as the successor in office and liability to Defendant Mudge for the damages caused by the official policy and/or practices of the Madison County State's Attorney's Office while Defendant Mudge was the State's Attorney.

21.     Defendants, Chris Hoell and Amy Chapman (hereinafter referred to as "Defendant Hoell" and "Defendant Chapman") are Assistant State's Attorneys employed by the Madison County State's Attorney's Office.   These defendants are sued in their individual and official capacity because at times relevant to this Complaint, he or she was a final policymaker responsible for his own actions and the actions of his   subordinate.

22.     Defendants, William Marconi and David Vucich (hereinafter referred to as "Defendant Marconi" and "Defendant Vucich") are detectives employed by the Madison County Sheriff's Office.   These defendants are sued in their individual capacities and official capacity because at times relevant to this Complaint, he was a final policymaker responsible for his own

actions and the actions of his   subordinate.

23.     Defendant, Captain Brad Wells (hereinafter referred to as "Defendant Wells") is employed by the Madison County Sheriff's Office.   This defendant is sued in his individual and official capacities because at times relevant to this Complaint, he was a final policymaker responsible for his own actions and the actions of his   subordinate.

24.     Defendant, Robert Hertz (hereinafter referred to as "Defendant Hertz"), is the Madison County Sheriff, and is sued in his individual and official capacities because at times relevant to this Complaint, he was a final policymaker responsible for his own actions and the actions of his   subordinate.

25.     Defendant Madison County is a governmental entity within the State of Illinois which consists in part of the Madison County State's   Attorney's Office (hereinafter referred to as "State's Attorney's Office") and the Madison County Sheriffs' Department (hereinafter referred to as "Sheriffs' Department"). Madison County, the Madison County State's Attorney's Office and the Madison County Sheriff's Department are necessary parties to this lawsuit.

26.     Defendant, Brian McKendry (hereinafter referred to as "Defendant McKendry") is police officer employed by the Chicago Police Department Office.   This defendant is sued in his individual and official capacities because at times relevant to this Complaint, he was a final policymaker responsible for his own actions and the actions of his   subordinate.

27.     Defendant City of Chicago is a governmental entity within the State of Illinois which consists in part of the Chicago Police Department.   The City of Chicago and the Chicago Police Department are necessary parties to this lawsuit.

28.     At all times relevant to this action, each of the named Defendants acted within the scope of his or her employment, and under color of the laws, regulations and customs of the State
of Illinois.   Each Defendant's   actions constituted "state action" as defined under federal law.

## FACTS

## THE ALLEGED CRIME

29.     On or about June 30, 2008, Madison County Sheriff Sergeant Goeken   responded to a call by witness, Donald W. Granada, that an intoxicated woman was banging on the door (hereinafter referred to as "Jane Doe") of his home located at 11231 Hillsboro Road, New Douglas, Illinois around midnight.

30.     After banging on the door of witness, Donald W. Granada, the intoxicated
                woman,
Jane Doe, ran across a corn field barefooted and banged on the door of the home of witness, Marlin R. Mitchell, located at 11231 Hillsboro Road, New Douglas, Illinois.

5

31.    Sergeant Goeken interviewed the 26 year old woman, Jane Doe.   She advised Sergeant Goeken that she had been drinking several alcoholic beverages for several hours with an Asian male she had met on Craigslist who she referred to as "John".   Jane Doe advised Sergeant Goeken that she went drinking with the John at Hot Shots and Morgan Street bars.

32.    She described the Asian male as 5 8", bald on the top of his head.    Mr. Huon is 5'4" and is not bald.

33.    Jane Doe advised Sergeant Goeken that she went with John to go to another bar called Pop's in Sauget.   Jane Doe stated that while John was driving on Interstate 55 heading north and traveling at highway speeds, he raised his voice at Jane Doe, that John said "suck his dick", that Jane Doe performed oral sex, and that John turned the car around and drove back on Interstate 55 heading south. Jane Doe told Sergeant Goeken that as John slowed his vehicle to make a turn, she jumped out of the car.

34. Jane Doe never described any act of force by John.   Jane Doe never told Sergeant Goeken that John   threatened her.    Jane Doe told the police Mr. Huon "yelled" the word "suck his dick" while the car was traveling at high speed

35.    Jane Doe gave a hand-written, signed statement to Sergeant Goeken.   The hand-written statement contradicted the statement she gave to Sergeant Goeken in his report.   Jane Doe stated that she was planning to meet a "John" at Patty O's, that she went drinking with him at Hot Shots bar, that she went drinking with him at Morgan Street bar, and that she left with him to go drinking at Pop's bar.   Jane Doe stated that while John was driving his car on Interstate 55 at highway speed, she performed oral sex on him, that he turned the car around and drove on Interstate 55 heading north.   Jane Doe wrote that as John slowed down to stop at a stop sign, Jane Doe jumped out of the car.   The statement makes no mention of John yelling or raising his voice or threatening Jane Doe.

36.    Jane Doe made changes to her statement, marking the changes with her initials. Jane Doe added that she met John on Craigslist for work.   Jane never described the details of the job: she did not know John's last name, the company he worked for, the job functions, the address of the company, the number of employees, a company phone number.

37.    Jane Doe lived in Carlinville, Illinois.   The Staunton exit described by Jane Doe is on the way to Carlinville, Illinois.    A sign stands near the exit with the word "Carlinville" and the number of miles to Carlinville.

38.    Jane Doe did not seek medical attention.   Her clothes were intact.   She did not have any injuries, except from the bottom of her feet from running across a cornfield barefooted while intoxicated.   There were no tears or rips or rumple in her clothing.   A photograph of Jane Doe showed her clothes to be intact.

39.    On June 30, 2008, Defendant, Madison County Sheriff Department, did not take a

DNA sample from Jane Doe.

40.     Jane Doe she went shopping the next day.

## INVESTIGATION BY
## THE MADISON   COUNTY SHERIFF'S DETECTIVES
## AND A RUSH TO JUDGMENT

41.     On June 30, 2008, at 8am, Defendant, Brad Wells, assigned Defendant Marconi, to investigate an unlawful restraint case.   Defendant Wells assigned Defendant Vucich   to investigate   in the same case but described it as a sexual assault case.

42.     Defendants Marconi and Vucich, did not call Jane Doe to arrange a meeting to interview her.

43.     Defendants Marconi and Vucich, rushed to judgment that Jane Doe was telling the truth.    Defendant Vucich began analyzing Craigslist.com and telephone records.

44.     Defendant Marconi investigated the scene where Jane Doe claimed to have jumped out of Mr. Huon's vehicle and found no physical evidence.   Defendant Marconi never investigated the exit described by Jane Doe which leads to Carlinville, Illinois, her hometown.

45.     Defendant Marconi never counted the number of stop signs that Mr. Huon's vehicle would have had to make a complete stop at, as described by Jane Doe.   The number of stop signs and complete stops made by the vehicle would have rebutted Jane Doe's claim that she had to jump out of a moving vehicle.

46.     Neither Defendant Marconi nor Defendant Vucich interviewed witness, Donald W. Granada.   A week before trial, Mr. Granada advised the investigator hired by Mr. Huon's criminal defense attorneys that he would not open his door, because Jane Doe was intoxicated and strange and erratic and smelled of alcohol.     The fact that Jane Doe reeked of alcohol and was intoxicated casts doubt on her story.

47.     Neither Defendant Marconi nor Defendant Vucich interviewed witness, Marlin R. Mitchell.   A week before trial. Mr. Mitchell advised the investigator hired by Mr. Huon's criminal defense attorneys that Jane Doe was intoxicated and smelled strongly and unpleasantly of alcohol.    Jane Doe told Mr. Mitchell that a man forced her into his car, kidnapped her,   and was trying to kill her.    Mr. Huon was not charged with kidnapping or attempted murder.   This statement contradicts Jane Doe's statement that she voluntarily got into Mr. Huon's car. Jane Doe never told the police that Mr. Huon kidnapped her or tried to kill her.

48.     On June 30, 2008, Defendants, Marconi and Vucich, obtained video footage of Jane Doe and Mr. Huon walking past the Broadway Oyster Bar.   The video footage was finally shown to Mr. Huon at trial in May of 2010.   The video footage shows Jane Doe and Mr. Huon,

dressed in shorts, sitting at a bar drinking for hours.   The video footage also shows Jane Doe walking in high heels.   Jane Doe would later tell the Defendant Detectives that she wore sandals and left them in Mr. Huon's vehicle.   The video rebuts Jane Doe's false statement that she was at a job interview.

49.     Defendants, Madison County Sheriff Detectives Vucich and Marconi, interviewed witness, Jennifer Cash, the waitress at Hot Shots.   Ms. Cash told the Defendant Detectives that Jane Doe and Mr. Huon were drinking for hours, that Jane Doe liked martinis, and that Jane Doe and Mr. Huon asked Ms. Cash what there was to do in St. Louis on a Sunday night.

50.     Until the day of trial in May of 2010, Defendants Marconi and Vucich, concealed from Mr. Huon that Ms. Cash had told them that Mr. Huon and Jane Doe were playing video games in the bar.   This exculpatory evidence rebuts Jane Doe's false statement that she was meeting Mr. Huon for work.

51.     Defendants Marconi and Vucich interviewed Dustin Snyder, date of birth October 15, 1976, the owner of Bushwoods bar.   Jane Doe never told the responding officer that she met Mr. Huon at Bushwoods.   At this point, neither Defendant Marconi nor Defendant Vucich had interviewed Jane Doe in person or by telephone–much less met her.

52.     Defendants, concealed that a Dustin Snyder of approximately the same age was arrested in 2008 and   convicted and sentenced in 2009   for possession and intent to distribute cannabis with co-defendant, Matthew Kochera, in Federal Court in St. Louis, Missouri. Defendants, concealed that Mr. Kochera, a convicted drug dealer, is   the boyfriend of Jane Doe. Bushwoods went out of business shortly before Mr. Snyder and Mr. Kochera were convicted. The issue of Jane Doe's drug use would have been exculpatory evidence to the defense of Mr. Huon and would have explained her strange and bizarre behavior on the night of the alleged incident.

53.     Defendants Marconi and Vucich did not speak to Jane Doe until almost the evening of June 30 2008 by telephone.   Jane Doe advised the Defendants Detectives that she met strangers through 30 to 40 postings on Craigslist.com.     Jane Doe told the Defendants Detectives that she had her first contact with a "John" on June 28, 2008 at 9:30 pm on a Saturday night.   Jane Doe continued to describe John as 5'8" or 5'9" and bald.

54.     Defendants   Marconi and Vucich falsely stated in their report that Jane Doe met the strangers   for purposes of finding a job, when the video footage clearly showed Jane Doe sitting in a bar drinking with Mr. Huon, dressed in shorts, on a Sunday evening.     There is no description in the police report as to the type of work performed by Jane Doe other than "promotions".   Jane Doe did not give the full name of John, the name of his company, the street address, the job functions, the hiring process.   Jane Doe gave no explanation to the Defendants Detectives as to why she would meet someone dressed in shorts on a Sunday night at a bar for a job interview and go drinking with him or play video games for hours and hours.   Defendants Marconi and Vucich simply rushed to judgment that Jane Doe was not lying.

8

55.     More importantly, Jane Doe told Defendants Marconi and Vucich that while John was driving his car on Interstate 55, traveling at highway speed, he "yelled" at Jane Doe and that she performed oral sex.

56.     Jane Doe never told the Defendants Detectives that John forced her physically to perform oral sex or threatened her.     Jane Doe told Defendants Marconi and Vucich that John "yelled" at her.   The police report states that "Throughout this the time this was occurring, John never threatened any particular act against her nor displayed any type of weapon."

57.     Jane Doe also told the Defendants Detectives that John would not let her open the window to the car.       Jane Doe would later testify at trial that Mr. Huon prevented her from opening the window, because the windows were power locks and Mr. Huon locked the control function.   Mr. Huon's vehicle was equipped with manual windows that had to be manually rolled down.   Defendants concealed photographs of Mr. Huon's vehicle until the very last day of trial when Defendant Marconi produced the photographs.   After being asked about photographs, Defendant Marconi admitted that he had not produced the photographs to Mr. Huon's defense team.   Defendants knew about this exculpatory evidence and concealed it from Mr. Huon and his defense attorneys.

58.     Defendants Marconi and Vucich told Jane Doe to go home and bring back some items of clothing.   Defendants Detectives allowed Jane Doe to choose the item of clothing and contaminate it with her DNA, without any formal procedures for chain of custody.    Defendant Marconi wrote in his report that he collected the clothing items chosen by Jane Doe on July 2, 2008 at 4:00 pm.   However, this statement is false, since Defendant Marconi later wrote in the report that he was in Chicago at that time arresting Mr. Huon and transporting him to the Madison County Jail.

## DEFENDANTS DETECTIVES ASK JANE DOE TO MEET PRIVATELY WITH JOHN TO COLLECT MONEY

59.     Incredibly, Defendants Marconi and Vucich ask Jane Doe–the alleged rape victim-
-to privately call her alleged attacker, Mr. Huon, and arrange a meeting between the two on the pretext of collecting money she believed was owed to her.   On June 30, 2008 at 9:00 p.m., Jane Doe called the Defendants Detectives asking about the money John said he would give her. Defendants Detectives ask Jane to contact John to arrange a private meeting with him.   Jane Doe volunteered to call John in a effort to collect the money she believed she was owed.

## ILLEGAL WARRANTLESS WIRETAP AND TRACING OF MR. HUON'S CELLPHONE

60.     Earlier in the day, on June 30, 2008, before applying for a warrant, Defendant Vucich completed an "exigent circumstances form" to Sprint PCS on June 30, 2008 to "ping" the

location of the cell phone of Mr. Huon.

61.     No exigent circumstances existed on June 30, 2008, when Defendant Vucich submitted the exigent circumstances form, because the alleged crime had ended and   Jane Doe was not any immediate danger or the threat of any bodily harm.   There was no continuing crime.

62.     The exigent circumstances form requested Sprint PCS to provide (1) subscriber information, (2) call detail records, and (3) call detail records with cell site information, all associated with the target phone number.   Notably absent in the exigent circumstances form was a   request for   the "precision location of mobile device (GPS Location)" , "Real-time audio interception (wiretap)", or "Real-time Pen Register, Trap & Trace."

63.     However, the GPS location of the target cell phone was secured prior to the issuance of a warrant.   Defendant Vucich asked Sprint PCS to give him the location of the cell phone before a warrant was issued.   Sprint PCS told Defendant Vucich the cell phone was located in Chicago.

64.     Defendants Detectives already had the location of the cell phone from Sprint PCS but applied for the search warrant as a pretext for searching Mr. Huon's apartment and computers located 300 miles away, to engage in a fishing expedition for embarrassing and damaging information that was not relevant to the case.

65.     The Stored Communications Act expressly prohibit the disclosure of information regarding   "the physical location of the [cell phone] subscriber" by telecommunication carries. 47 U.S.C. Section 1002(a)(2)(B).


66.     The Pen Register Act, specifically   makes it illegal for any   person to " install or use a pen register or a trap and trace device without first obtaining a court order under section", 18 U.S.C., Chapter 206, Section 3121. The Pen Register Act specifically requires a "state investigative or law enforcement officer" or "Attorney for the Government" to make an application to the court to obtain an order for the use of a pen register or trap and trace device anywhere in the United States.   18 U.S.C., Chapter 206, Section 3127.

67.     No exigency existed to justify a warrantless search in the form of "pinging" the Mr. Huon's cell phone and all evidence resulting from that search must be suppressed as fruit of the poisonous tree. The Madison County Sheriff's Department unlawfully sought information from Mr. Huon's cellular service provider via an "Exigent Circumstances Form" despite the lack of any such exigency. On June 30, 2008, the Sheriff's Department sought Mr. Huon's cell phone records, and apparently real-time cell site location data prior to the issue of the first warrant on July 1, 2008.


## DEFENDANT VUCICH SUBMITS A SWORN AFFIDAVIT REPLETE WITH FALSE STATEMENTS

68.     Defendants Detectives already had the location of the cell phone from Sprint PCS but applied for the search warrant as a pretext for searching Mr. Huon's apartment and computers located 300 miles away, to engage in a fishing expedition for embarrassing and damaging information that was not relevant to the case.

69.     After Defendant Vucich illegally had Mr. Huon's cell phone "pinged", but before a warrant was issued for the location of the cell phone, Defendant Vucich submitted an affidavit for a warrant to subpoena the cell location for   Mr. Huon's cell phone--essentially to have Mr. Huon's cell phone pinged.

70.     The warrant and supporting affidavit in no way describe how call records would evidence the crimes of unlawful restraint and sexual assault.   Rather, the historical information and the prospective cell-site data   could indicate only that someone with the target cell phone had indeed contacted the alleged victim.   No evidence suggests that the cell phone or the location of the cell phone would evidence a crime.

71.     In fact, the location of the cell phone, gleaned by pinging the device, was not sought to evidence a crime at all.   It is apparent that law enforcement sought the cell site location data not because the location of the phone would evidence a crime, but because it was assumed the phone location would yield a suspect.   The existence of a suspect is not, of itself, evidence that a crime was committed.   This approach circumvents lawful procedures such as an at-large warrant.

72.     The warrant was also a pretext for Defendants to search Mr. Huon's computers and apartment located 300 miles from the alleged crime scene–which had allegedly been completed–in an effort to gather and convict Mr. Huon based on irrelevant but embarrassing and damaging information.

73.     Defendant Vucich stated in his affidavit that a representative from Sprint "pinged" the target phone and gleaned a GPS location which revealed that the target phone was located in Chicago, Illinois.    Neither the search warrant nor the accompanying documents describe what items were expected to be found and seized which would be probative of a crime.
However, the GPS location of the target cell phone was secured prior to the issuance of the warrant according to Detective Vucich's affidavit in support.    The affidavit stated that on July 1, 2008, a representative from Sprint "pinged"   the target phone and gleaned a GPS location which revealed that the target phone was located in Chicago, Illinois.

74.     On July 1, 2008, at 10:30 a.m., the warrant in case number 08MR385 was issued authorizing the seizure of both historical and prospective information pertaining to the target cell phone number.    Warrant 385 named Sprint PCS as the entity to be searched.   In addition to historical records, warrant 385 also described prospective records to be seized, including cell site activations, a map of cell-site tower locations, a map of all cellular towers in the specified market, and "the GPS location of cell phone if available".

11

75.    On July 1, 2008, at 5:20 p.m. Warrant 386, issued second in time, on July 1, 2008, at 5:20 p.m., describes the place to be searched as a "brown apartment building" at 3038 South Canal Street, in Chicago, Illinois.    Defendant Vucich's affidavit in support of warrant 386 stated that the target cell phone was "pinged" and revealed a GPS location originating from a "latitude of 41.8388222 and a longitude of -87.6380222"; purported to be accurate "within a radius of nine meters."

76.    Defendant's   Vucich's affidavit further details the findings of Defendant McKendry of the Chicago Police Department which indicated that one of the residents of the apartment building, who appeared to be of Asian descent, had received a package with his name on it.   That person is the defendant, Meanith Huon.   Defendant Vucich believed "Huon" to be an Asian name.    On the contrary, Huon is a common French surname.   Cambodia was a French colony.   Jean-Michel Huon de Kermadec, an 18th Century French explorer,   sailed around Australia and Cambodia, where Mr. Huon was born.   There is a region in Australia called the Huon Valley.

77.     According to Defendant Vucich, both Huon and the suspect depicted in the tavern
surveillance footage had a "distinct hairline" and were similar in age and weight.    This is a false statement since Jane Doe described John as bald and 5'9".   Mr. Huon's driver's license states that he is 5' 5" and shows a picture of a full head of hair.

78.    Warrant 386 does not specify a unit or even a doorway that that is the target of the search.   The place to be searched is described as follows: A brown apartment building located at the physical address of 3038 Canal St., Chicago, Illinois.   The warrant did not indicate that the entire apartment building was intended to be searched.   Indeed, only the residence of the man believed to have an Asian name was intended to be searched.   Mr. Huon lives in Chinatown, Chicago, Illinois and there are Asian-Americans living next to him and other people who had lived in his building with Asian sur-names.   The report that Defendant Vucich ran for the apartment that Mr. Huon lives at produced several Asian sur names, including Deepika Rajam Thiagarajan, Samuel Wong, Paula Wong, Yat Lam Wong,     The report identified neighbors with Asian sur names, including, Ling Li, Shaojie Tang, Mii Yin Auyeung, Yanming Zhan,

79.    Defendant Vucich's affidavit stated that video footage was obtained to corroborate Jane Doe's account that she met with John to discuss a marketing job.    Defendant Vucich intentionally concealed exculpatory evidence.   Defendant Vucich concealed that the video shows Jane Doe meeting with Mr. Huon in shorts on Sunday at a bar, drinking alcohol. The affidavit intentionally omitted that Jane Doe could not give the last name of John, his title, the name of his company, the address for his company, the terms and conditions of the job, the start and end date, the salary, even though Jane Doe had allegedly spent hours talking to John. The affidavit intentionally concealed that Jane Doe went bar hopping with Mr. Huon and drank more than nine or more drinks.    The affidavit intentionally concealed Defendants Detectives' interview with the waitress, Jennifer Cash, who described Jane Doe playing video games and

drinking martinis with Mr. Huon.

80.     The affidavit concealed that   Jane Doe worked for escort service called the Alpha One Agency with a phone number and no street address.    The affidavit intentionally concealed that Jane Doe was unemployed and had a Link card and was receiving public assistance.   The affidavit concealed that Jane Doe never sought medical attention, went shopping the next day, and called the detectives and volunteered to call Mr. Huon about money that she believed was owed to her.

81.     Defendant Vucich's affidavit intentionally omitted that Jane Doe was intoxicated and reeked of alcohol and was acting in a bizarre fashion, running barefooted across a cornfield and banging on the doors of the witnesses.

82.     More importantly, the affidavit contained the false statement that Mr. Huon "forced" Jane Doe to perform oral sex.   The statement given by Jane Doe was that Mr. Huon allegedly "yelled" at Jane Doe and at some point in the vehicle, and Jane Doe performed oral sex while Mr. Huon was driving at highway speed.   The affidavit intentionally omitted the fact that there were no allegations of force in this case.      The affidavit omitted that Jane Doe does not even allege that Mr. Huon yelled at her in her hand-written statement.

83.     Worse, Defendant Vucich's affidavit falsely stated that Mr. Huon ripped Jane Doe's clothes off when the picture of Jane Doe taken by Madison County Sheriff showed all her clothes to be intact.   Nowhere in the police report does Jane Doe state that her clothes had been ripped off.

84.     Defendant Vucich's affidavit falsely stated that Mr. Huon was traveling across the country from Texas on an alleged crime spree. The phone records do not identify any calls to or from Texas.

85.     Defendant Vucich's affidavit falsely stated that there were other there were other alleged victims who were allegedly contacted.   The affidavit false states that other women were interviewed by Defendant Vucich and that they identified a man named "John".   The police report written by Defendants Vucich and Marconi state that the women contacted by detectives could not identify the name of anyone who had called, much less give a description.   Defendant Vucich falsely stated that these women had careers in marketing.   Defendant Vucich holds himself out as a computer expert.   Defendant Vucich could have easily performed a Google search of some of the women he interviewed, which would have returned   search results of nude or adult images that the women posted of themselves online.

86.     Defendant Vucich's affidavit falsely stated that the women received a suspicious call, that the suspect made them an offer, and that the women refused the offers.   This statement is not supported by the phone records that Defendant Vucich had subpoenaed.   The telephone records show several of the women calling Mr. Huon's phone repeatedly and that Mr. Huon simply ignored the calls.   Katie Smart told the Defendants Detectives that she ignored a telephone call she received at 9:00 pm because it was late and, thus, suspicious.   The phone

records show that Ms. Smart called Mr. Huon at least 4 times on June 28, 2008 and that he simply ignored her calls.   Erica Marcinkiewicz told Defendants Detectives she blew off a call from Mr. Huon's call phone.   The phone records show Ms. Marcinkiewicz called Mr. Huon's cell phone at least 2 times on June 29, 2008 and that he ignored her calls.   Melissa Bright told Defendants Detectives that she received a call from Mr. Huon's cell phone.   The phone records show Ms. Bright calling Mr. Huon on June 28, 2008 around 10:00 p.m.

87.     The summary of the interview in the police report are all the same.   The women reported that she received a telephone call from someone who she could not positively identify by name.   The Defendants Detectives made no notes as to what were the prior marketing careers or jobs of these women.   Defendants Detectives simply fabricated that these women held previous jobs in the marketing industry.    Of all the women that were interviewed, the Defendants Detectives do not identify a single marketing company.

88.     More importantly, the phone records were completely irrelevant.    Jane Doe told the detectives that Mr. Huon did not force her and did not threaten her.   She complained that Mr. Huon "yelled".   At trial, Defendants never even asked Jane Doe the words that Mr. Huon allegedly yelled and Jane Doe was unable to describe any force that was used.

89.     Defendant Vucich's false affidavit was submitted as a pretext to obtain a search warrant to search Mr. Huon's computers and apartment located in Chicago 300 miles away from the alleged crime scene, to engage in a fishing expedition for damaging and embarrassing but non-relevant information.    The items sought in the search warrant were not used in the alleged crime.   As previously stated, the alleged crime was Mr. Huon's "yelling" at Jane Doe while driving down Interstate 55 at highway speed, with the radio on and the rush of noise and wind from the exterior of the vehicle.

## MEANITH HUON'S INTERROGATION AND THE FALSE STATEMENTS MADE BY DEFENDANT MARCONI IN THE POLICE REPORT

90.     Defendants Marconi and Vucich rushed to judgment that Mr. Huon was guilty of the alleged crime.   Defendants Detectives never interviewed the witnesses on the scene, who would have provided exculpatory evidence.

91.     On July 2, 2008, around midnight, Defendants Marconi and Vucich and the 15-20 Chicago Police Officers executed a search warrant on Mr. Huon's residence.   The law enforcement officers wore flak jackets and had their guns drawn.

92.     Defendant McKendry testified that Mr. Huon was under arrest by Defendants Marconi and Vucich from the moment he opened the door.   Mr. Huon was hand cuffed immediately.

93.      Defendant Marconi lied in his report when he stated that he showed Mr. Huon the search warrant.

14

94.    Defendant Marconi lied in his report when he wrote that Mr. Huon initialed the the Miranda Waiver Form.

95.    Defendant McKendry testified that Mr. Huon never signed or initialed the Miranda Waiver Form.    Defendant Marconi fabricated evidence.

96.    Incredibly, Defendant McKendry testified that a Miranda Waiver Form was not a waiver of a defendant's rights but was a form advising the defendant of his rights.   The Miranda Waiver Form clearly states that the defendant is waiving his rights at this time.

97.    Defendant Marconi lied in his report when he stated that he told Mr,. Huon he wanted to obtain a more detailed statement at the local Chicago Police precinct and that Mr. Huon stated he would like to continue speaking with the detective.   Defendant McKendry stated that . Mr. Huon was placed immediately under arrest and in handcuffs after he opened the door.

98.    Defendants lied when they stated or testified that Mr. Huon was read his Miranda rights.   As a matter of official policy and practice, the Madison County Sheriff Department and the Chicago Police Department did not read a defendant his Miranda rights.

99.    The interrogation was continued at the local Chicago Police precinct in a holding cell.  Defendant Marconi told Mr. Huon, as stated in the police report, that "that at no time was he being accused of striking her nor physically threatening her with violence." Defendant Marconi stated in his report that he told Mr. Huon that Jane Doe "had been very intimidated by Huon reportedly yelling at her."

100.    Defendant Marconi went on to write in his report that he told Mr. Huon that "a small amount of physical contact" was alleged by Jane Doe.

101.    Notwithstanding the aforesaid, Defendant Marconi repeatedly called Mr. Huon a liar.   Eventually, Defendant Marconi told Mr. Huon the detective was terminating the interrogation as long as Mr. Huon was lying.   Defendant Marconi had already rushed to judgment that Mr. Huon was guilty and was not seeking the truth but seeking to gather evidence to incriminate Mr. Huon.

102.    The details of the "story" in the police report originated with Defendant Marconi, who fabricated evidence and lied in the report.

103.    Despite Mr. Huon repeated claims of innocence, a systematic effort was made by Defendants Marconi and Vucich to intimidate, coerce, confuse, mislead and trick Mr. Huon into implicating himself in the alleged crime.

104.    Mr. Huon was kept in a locked area from midnight until the next day in the afternoon, without access to food, water, the bathroom.

105.    Mr. Huon was subjected to confrontational and aggressive interrogation by

15

Defendant Marconi, who tried to convince Mr. Huon that his situation was hopeless, and the evidence would inevitably lead to conviction of the rape charges, unless he implicated himself in the crime.

106.    Defendant McKendry, who was contacted by Defendant Marconi, agreed to assist in the interrogation.

107.    The mental torture of Mr Huon had no bounds.   Defendant Marconi told Mr. Huon that "there were bruises on her neck", that "that girl will never be the same again", that Defendant Marconi's brother had made the same "stupid" mistake, that Mr. Huon should not put Jane Doe through a trial, that if Mr. Huon did not confess, Defendant Marconi would tell the State's Attorney to "come down hard" on Mr. Huon.

108.    The bad faith and reckless disregard of the Defendant Detectives was demonstrated by their failure to properly investigate the case.   Defendant Detectives prepared false police reports which led to the continued prosecution of Mr. Huon.

109.    Mr. Huon was taken to the Madison County Jail where he was stripped naked. This was standard protocol in Defendant Hertz administration, and . Being subjected to this ritual resulted in Mr. Huon experiencing even further humiliation.


## POST-ARREST PUBLICITY AND
## THE FALSE STATEMENTS RELEASED BY THE DEFENDANTS

110.    After the arrest of Mr. Huon , a whole series of damaging statements were released by Defendants.

111.    Defendant Brad Wells issued a press release to the Madison County Record stating that:

> According to a press release issued by Capt. Brad Wells, the victim was under the impression Huon was a supervisor for a company that sets up promotions for companies in the area taverns for alcohol sales.

> After Huon and the victim met, he offered to take her to Pop's Saloon in Sauget, to check how other women who worked for him were doing with a current promotion.

> The victim agreed and got into his vehicle, but became concerned when Huon passed the Sauget exit and continued to drive on the interstate.

> The victim alleged that after Huon passed the exit he started to sexually assault her in the

16

vehicle.

She told deputies she asked Huon to let her go, however he refused and when he pulled off the interstate in the area of New Douglas Road, the victim jumped from his car when he attempted to turn around.

After the report was taken, detectives with the Madison County Sheriff's Department were able to identify Huon through interviews, surveillance footage, and communication records.

Detectives called the Chicago Police Department who provided surveillance on Huon's residence throughout the day on July 1, and later executed a search warrant signed by Madison County Circuit Judge Charles Romani

112.    This statement contained false statement and defamed Mr. Huon.

113.    Defendants issued this statement for the purpose to bias and influence the potential jurors in the trial, inflame the passions of the community, and prevent Mr. Huon from having a fair jury trial in Madison County.

114.    Defendants Brad Wells and Madison County Sheriff Department deputies issued a statement to the Alton Telegraph stating that:

A Chicago lawyer was charged Wednesday with five felonies for allegedly assaulting a woman while driving his car on Interstate 55.

Meanith Huon, 38, was charged in Madison County Circuit Court with two counts of criminal sexual assault, two counts of criminal sexual abuse and a count of unlawful restraint.

Authorities said Huon allegedly lured a woman into a car he was driving Sunday night, then committed the alleged sexual acts on her while driving on I-55.

He allegedly forced the woman to perform a sex act on him, fondled her breast and genitals, and refused to let her out of the car while driving on the interstate into Madison County.

She told police she was able to jump out of the car as Huon was making a turn and had slowed almost to a stop. She suffered abrasions but got to a home in the 1200 block of New Douglas Road, New Douglas, and asked the residents to call police.

Madison County sheriff's deputies said the incident began as a result of the victim looking for a job on an Internet blog. After talking to Huon over the telephone and getting the impression that the job was in promoting alcohol sales in area taverns, she met Huon, who identified himself as "John," in downtown St. Louis.

17

After she got into the car, he told her that other women doing the promotional work for him were working at Pop's Saloon in Sauget. He offered to drive the victim there to check on the type of night the women were having.

However, he did not turn off at the exit to Sauget, but allegedly sexually abused and assaulted his passenger while driving on the interstate.

After the woman jumped from the car, Huon drove from the area, deputies said.

Lt. Brad Wells of the Madison County Sheriff's Department said some information about Huon's identity was obtained by looking at images from security cameras in downtown St. Louis. Other information was obtained from communications records.

Once he became a suspect, the Chicago Police Department did surveillance on Huon's residence on Tuesday. Madison County deputies went to the residence and executed a search warrant, along with Chicago police officers.

Wells said some items were taken from the home as evidence.

Deputies still are processing the evidence in Chicago. Huon was held in Chicago and will be transported to the Madison County Jail in Edwardsville.

"The investigation of Huon is ongoing, and attempts are being made to determine if other incidents exist," Wells said.

Huon's bail was set at $100,000 by Circuit Judge Charles Romani Jr.

115.    This statement contained false statement and defamed Mr. Huon.

116.    Defendants issued this statement for the purpose to bias and influence the potential jurors in the trial, inflame the passions of the community, and prevent Mr. Huon from having a fair jury trial in Madison County.

117.    Defendants sought to label Mr. Huon as "Chicago lawyer" when he worked for Edward Jones Investments as a financial advisor.

## PROSECUTORIAL MISCONDUCT

118.    The Madison County State's Attorneys' Office engaged in prosecutorial misconduct in an effort to pressure Mr. Huon to plead guilty to alleged crimes that he did not commit and to deprive him of his constitutional rights.

119.    Mr. Huon was represented initially by Justin Kuehn of The Kuehn Law Firm and William Lucco of Lucco Brown.   Defendant Mudge was former law partners with Lucco Brown.

120.    Defendant Hoell falsely told Justin Kuehn that there were other victims, including a woman in Wisconsin, and that the forthcoming discovery would show that Mr. Huon was a sexual predator.

121.    Having received this confidential information from the office of Defendant Mudge, who was former law partners with Mr. Lucco, Justin Kuehn advised Mr. Huon that he will be convicted and should plead guilty.

122.    The continuing inappropriate comments by Defendant Mudge's Office to his former law firm Lucco Brown and to Justin Kuehn prejudiced Mr. Huon's Sixth Amendment right to counsel, without the State's Attorney's Office pressuring his former law firm to have a high profile defendant plead guilty to a crime he did not commit.

123.    Defendant Hoell never produced any evidence of other alleged victims nor did he produce the name of any woman from Wisconsin.   Defendant Hoell never produced any evidence that Mr. Huon was a sexual predator.    Defendant Hoell knew that there was no force alleged in this case.   Jane Doe alleged that Mr. Huon "yelled" at her in the car.   Defendant Hoell made these false statements to pressure Mr. Huon to plead guilty to crimes he did not commit.

124.    Defendant Hoell made similar false statements to Mr. Huon's subsequent defense Attorney.   Defendant Hoell advised Mr. Huon's defense attorney that "snuff films" were found on Mr. Huon's computers.    There has never been a record of a "snuff film" ever being produced.   No "snuff films" were found on Mr. Huon's computer.   Defendant Hoell made the false statement to pressure Mr. Huon to accept a guilty plea and deprive Mr. Huon of his 7th Amendment right to a jury trial.

125.    Defendants Hoell and Chapman continued to make false statements at motion hearings and at trial.    Defendants Hoell and Chapman continued to falsely describe the alleged crime as involving a significant amount of force and violence.   Jane Doe never described any force or threat of force.   Defendants knew that the police report stated that no force or threat of force was used.    According to the police report, Jane Doe stated that Mr. Huon yelled "suck his dick".   Defendants Hoell and Chapman never even asked Jane Doe at trial what Mr. Huon yelled.

## RETALIATORY ARREST AND PROSECUTION IN 2009

126.    In 2008, after Mr. Huon's arrest, Jane Doe traveled to the law office of Mr. Huon's prior criminal defense attorney, William Lucco of Lucco, Brown, in Edwardsville,

Illinois.    Mr. Lucco advised Mr. Huon that he turned Jane Doe away, who began crying.

127.    In 2009, Jane Doe began Googling "Meanith Huon" and following him online, in an attempt to stalk Mr. Huon online and communicate with him.

128.    In July of 2009, Jane Doe came across a private blog that she believed was written by Mr. Huon about her.   The blog did not refer to Jane Doe by her legal name.

129.    The blog did not state anything threatening or intimidating.   The blog discussed God, contained a journal or diary entries, contained musings on life.

130.    Jane Doe advised the Madison County State's Attorney's Office that she had Googled Mr. Huon and was following him online monitoring his activities.

131.    Unable to pressure Mr. Huon to accept a guilty plea of 12 years in the 2008 case, Defendants retaliated by falsely arresting Mr. Huon and prosecuting him for additional felony charges in 2009.

132.    Defendants made false statements to Mr. Huon's attorney in an effort to pressure Mr. Huon to plea and deprive him of his right to a jury trial.

133.    Defendant Vucich signed a sworn statement for an arrest warrant to be issued for Mr. Huon, based on information.   Defendant Vucich described the words in the blog that allegedly constituted a crime: "I know you're struggling to make ends meet day to day.   But I can't contact you, remember.   I am an attorney, I have to follow the rules"    Defendant Vucich also identified this sentence from the blog: "10 reasons why I'd make a good husband for you 'dede'."

134.    The Madison County State's Attorney's Office charged Mr. Huon with two more felony counts of cyberstalking and witness harassment, even though Jane Doe had Googled Mr. Huon.

135.    On July 17, 2009,Defendant Hoell filed a verified petition to revoke Mr. Huon's bond on the basis that he had committed felonies while he was out on bond.   Defendant Hoell knew that under 725 ILCS 5/110-6, a defendant's bond cannot be revoked unless he commits a forcible felony while out on bond and that cyberstalking and witness harassment were not forcible felonies.   Defendant Hoell's false representations in his verified petition led to the Court issuing an arrest warrant for Mr. Huon with a no bond order.

136.    Mr. Huon was arrested by Chicago Police Department on or about July 19, 2009 on the arrest warrant issued in the 2009 case.

137.    Mr. Huon was held at the Cook County Jail and transferred and held at the Madison County Jail until he advised his attorneys and the Court that a his bond could not be revoked, since the charges of cyberstalking and witness harassment are not forcible felonies.

138.     After Mr. Huon's arrest, Defendants Vucich and Marconi attempted to interrogate Mr. Huon.   Mr. Huon reminded the detectives that he was represented by Scott Rosenblum and Michael Mettes.   Defendants Detectives' response was that Mr. Rosenblum and Mr. Mettes was not Mr. Huon's lawyers in the 2009 case and that Mr. Huon had not retained lawyers in the 2009 case.

139.     After Mr. Huon was released on bond in the 2009 case, he found defamatory statements on a website called lawgossip.com that described him as a serial rapist.   The author of the website incorrectly treated the complainant in the 2008 and 2009 case as two different complainants, when in fact they were the same woman.   Jane Doe was the complainant in both the 2008 and 2009 case.   Mr. Huon contacted the owner of the website and asked him or her to remove the defamatory content, since it could prejudice and bias potential jurors.   Defendant Hoell immediately contacted Mr. Huon's defense counsel, Michael Mettes, the next day. Defendant Hoell told Mr. Huon's defense attorney to tell Mr Huon that the State would bring further felony charges against Mr. Huon if he continued to contact website owners such as lawgossip.com about removing the defamatory statements.     Defendant Hoell told Mr. Huon's defense attorney to direct Mr. Huon to have no online presence whatsoever.

140.     The actions of Defendants Hoell and the Madison County State's Attorney's Office seriously damaged Mr. Huon's relationship with his defense counsel and infringed on his right to Free Speech under the First Amendment.   The aforesaid unlawful actions of Defendants against Mr. Huon were an impermissible interference in the relationship between Mr. Huon and his attorneys.   Defendants also deprived Mr. Huon's right to a jury trial of jurors who had been prejudiced by reading false and defamatory online content that falsely accused Mr. Huon of being a serial rapist.     Defendants also deprived Mr. Huon's First Amendment right to associate online.

## POST-ARREST PUBLICITY AND
## THE FALSE STATEMENTS RELEASED BY THE DEFENDANTS IN THE 2009 CASE

141.     After the arrest of Mr. Huon , a whole series of damaging statements were released by Defendants.

142.     Defendant Brad Wells issued a press release to the Alton Telegraph stating that:

 A Chicago lawyer arrested and charged last year with criminal sexual assault, sexual abuse and unlawful restraint now faces charges of harassing his alleged victim and cyber stalking.

Meanith Huon, 39, was charged this week in Madison County Circuit Court with harassment of a witness and cyber stalking.

He is accused of contacting his alleged victim of last year via the Internet and communicating indirectly with her in such a way as to cause her emotional distress.

He also is accused of maintaining an Internet Web page or Web site to harass the victim or an immediate family member.

After being arrested last year for allegedly forcing the victim to perform sexual acts while driving on Interstate 55 in Madison County, he posted $10,000 cash bond and went back to Chicago.

Authorities say Huon began posting comments directed at the alleged victim, telling her he loves her and claiming that God wants them to be together.

The postings include a wide variety of professions of love, along with religious references. As recently as July 17, he posted: "I haven't kissed anyone since you kissed me. I miss you. There's nothing I can do about it. I follow God's Commandments. I walk the line because I love you."

He also posted "10 reasons why I'd make a good husband for you." The No. 1 reason was listed as "God brought us together." The suspect also allegedly posted the words: "We'd have great kids. My brains. Your looks."

Huon was arrested in early July 2008 after he allegedly forced a woman to have oral sex with him, fondled her vaginal area and her breasts and refused to let her out of the car while driving on I-55 into Madison County.

The woman allegedly was lured over the Internet by the possibility of a job.

She told authorities she talked to Huon by telephone and got the impression that the job was promoting alcohol sales in area taverns. She met Huon in downtown St. Louis, and he offered to drive her to a local saloon to check out how the business was going.

However, they did not go to the tavern, and Huon instead allegedly sexually abused and assaulted her, Capt. Brad Wells of the Madison County Sheriff's Department said last year. The woman eventually jumped out of the car and contacted police.

Police found evidence on the most recent case by obtaining a search warrant for the company that operates the Web site used by Huon. Once the evidence was obtained, Huon again was arrested July 19, this time at his home in Chicago, where he was being held Thursday in lieu of $75,000 bail.

.      143.    This statement contained false statement and defamed Mr. Huon.

144.    Defendants issued this statement for the purpose to bias and influence the potential jurors in the trial, inflame the passions of the community, and prevent Mr. Huon from having a fair jury trial in Madison County.

145.    The inmates at the Madison County Jail who read the article attacked Mr. Huon, after reading the article.

146.    The Madison County Sheriff Department knows that inmates at the Madison County Jail do not disclose their full name and what they are charged with.   The Sheriff Department knew that Mr. Huon was in protective custody.   They knew that inmates received copies of the Alton Telegraphy by mail.

147.    As a matter of official policy and practice, the Madison County Sheriff Department's policy of issuing press releases serves no purpose other than to bias potential jurors, try the defendant in the news media, and place defendants in custody in imminent bodily harm or the threat of bodily harm.

148.    As a matter of official policy and practice, the Madison County Sheriff Department and the Madison County State's Attorney's Office released press release replete with false statements, in an effort to bias potential jurors.   When Mr. Huon attempted to correct the defamatory and false statements being published, the Madison County State's Attorney's Office contacted Mr. Huon's attorney and threatened additional felony charges

## DETENTION OR INCARCERATION OF MR. HUON

149.    Mr. Huon was detained or incarcerated at the Chicago Police Department holding cell and at the Madison County Jail in 2008.   During this time, he was subjected to strip searches. The official practice and police of Defendants to strip search Mr. Huon caused him to suffer damage.   He was   detained or incarcerated at the Chicago Police Department holding cell, at the Cook County Jail, and at the Madison County Jail in 2009. During this time he was subjected   to strip searches.   The official practice and police of Defendants to strip search Mr. Huon caused him to suffer damage.

## EXONERATION OF MR. HUON

150.    On the State's own motion, Defendants   nolle prosequi the two counts of sexual abuse and one count of unlawful restraint   against Mr. Huon.

151.    Mr. Huon was acquitted by a jury who took two hours to render a verdict on the two counts of sexual assault.

152.    Defendants' ongoing efforts to implicate Mr. Huon in these alleged crimes have only added to and exacerbated the plaintiffs' damages, and further demonstrate Defendants' continuing malice towards Mr. Huon.

153.    Defendant McKendry, testified falsely at trial in an ongoing effort to implicate Mr. Huon in these alleged crimes.

154.    Defendants Hoell and Chapman continued to falsely state that force and violence was used in the alleged crimes.

155.    After the trial, Defendant Mudge stated  the following to the Alton Telegraph:

Madison County State's Attorney William Mudge said he thought the state put on a good case.

"We're disappointed. This happens from time to time," Mudge said. "We thought the victim was credible, but obviously, the jury had doubts."

  156.  This statement contained false statement and defamed Mr. Huon.


## EXCULPATORY EVIDENCE

157.    Defendants concealed or withheld exculpatory evidence and fabricated statements.

158.    Defendants withheld the DNA report dated October 17, 2008 until the eve of the trial.   The DNA report stated that no semen was found.

159.    Defendants withheld the FTK report until a few months before the trial.

160.    Defendants withheld photographs of Mr. Huon's vehicle taken in 2008 until the last day of the trial.


161.    The pattern of constitutional violations for maliciously prosecuting individuals without regard to guilt or innocence was known by Defendant Mudge, or should have been known by him, such that there was an obvious need to take some action to control, supervise, discipline, train, investigate, or intervene so that these constitutional violations would cease to occur.   The failure of Defendant Mudge to take appropriate action to control, supervise, discipline, train, investigate, or intervene with respect to the prosecutors amounted to a deliberate indifference to the unconstitutional practices of these prosecutors, in failing to turn over exculpatory evidence, and maliciously prosecuting individuals without due regard for guilt or

innocence. Indeed, the constitutional violations in this case were the direct result of Defendants' general policy of securing convictions through overly aggressive tactics and a specific policy in this case of doing whatever was necessary to secure a conviction and sentence motivated by the high-profile nature of the crime and the political motivation.

162. The unwritten practice of Defendant Mudge and the Madison County State's Attorney's Office led to the deprivation of Plaintiff, Meanith Huon's, constitutional rights in the criminal proceedings against him and the malicious prosecution.

163. The pattern of constitutional violations for falsely arresting individuals without regard to guilt or innocence was known by Defendant Hertz, or should have been known by him, such that there was an obvious need to take some action to control, supervise, discipline, train, investigate, or intervene so that these constitutional violations would cease to occur. The failure of Defendant Hertz to take appropriate action to control, supervise, discipline, train, investigate, or intervene with respect to the detectives amounted to a deliberate indifference to the unconstitutional practices of these prosecutors, in failing to turn over exculpatory evidence, and maliciously prosecuting individuals without due regard for guilt or innocence. Indeed, the constitutional violations in this case were the direct result of Defendants' general policy of securing arrests through overly aggressive tactics and a specific policy in this case of doing whatever was necessary to secure a conviction and sentence motivated by the high-profile nature of the crime and the political motivation.

164. The unwritten practice of Defendant Hertz and the Madison County Sheriff's Office led to the deprivation of Plaintiff, Meanith Huon's, constitutional rights in the criminal proceedings against him and the malicious prosecution.

## POLITICAL   MOTIVATIONS OF DEFENDANT MUDGE

165. Defendant Mudge was planning to run for the elected office of judge.

166. In January of 2009, Defendant Mudge and the Madison County State's Attorney's Office dropped the ball by allowing a serial DUI offender, Donald W. Canterbery, to plead guilty and receive probation. Mr. Canterbery had 5 prior DUIs. On February 24, 2009, Mr. Canterbery, while driving under the influence, accidentally killed a young couple and their unborn child.

167. Defendant Mudge's brother had been arrested for Driving Under the Influence and received probation.

168. Not wanting to appear soft on crime, Defendant Mudge prosecuted Mr. Huon, who was a high profile defendant, knowing that there were no allegations or evidence of force or

25

unlawful restraint in the case.

169.     In fact, after Mr. Huon was acquitted in the 2008 case, Defendants Mudge and Madison County State's Attorney's Office struck the 2009 case from the trial call for more than 160 days until December 6, 2011.   On or about the same day that Defendant Mudge was sworn into office as an elected judge, Mr. Huon's 2009 charges were nolle prosequi by the State,

170.     The timing of these political events coincided with the decision to interrogate, arrest, and prosecute Mr. Huon.   Defendant Mudge's quest for power led him to abuse the power he already possessed.

171.     The only possible motive for the arrest and prosecution was political, because no evidence had been developed against Mr. Huon

## DEFENDANT MCKENDRY AND THE CHICAGO POLICE DEPARTMENT

172.     Defendant McKendry told Mr. Huon that the Miranda Waiver Form was not a waiver of his rights.

173.     Defendant McKendry participated in the interrogation of Mr. Huon and did nothing to stop the aggressive interrogation of Mr. Huon by Defendant Marconi.

174.     Defendant McKendry lied and made false statements during the motion to suppress hearing and at trial.

175.     As a matter of official policy and practice, Defendants McKendry and the Chicago Police Department will execute a search without any scrutiny as to the validity of the warrant.

176.     As a matter of official policy and practice, Defendants McKendry and the Chicago Police Department will allow its officers to testify in court at a motion to suppress and at trial in a case in which the officer could not have any knowledge or memory of the events themselves.

177.     Defendant McKendry could not have recalled the events of the execution of the search warrant and the interrogation, having generated no detailed notes.

178.     Defendant McKendry relied on the false statements and representations of Defendants Marconi and Vucich and their false reports and statements.

## COUNT I
### (Due Process- 42 U.S.C. § 1983)

1-178.        Plaintiff, Meanith Huon, realleges, restates and incorporates by reference,

26

paragraphs 1-178 of this Complaint at Law as and for paragraphs 1-178 of this Count I. Defendants, while acting under color of law and within the scope of their employment, deprived Plaintiff, Meanith Huon, of his constitutional right to due process. Each of the Defendants, deliberately fabricated false statements and deliberately obstructed justice, thereby causing the false arrest of Plaintiff, Meanith Huon, causing him to be falsely imprisoned, prosecuted and/or defamed.

179.    Defendants provided false allegations that were the basis of the criminal complaint and/or withheld exculpatory evidence.

180.    Absent this misconduct, the arrest and prosecution of Plaintiff, Meanith Huon, could not and would not have been pursued and justice would have not been obstructed .

181.    As a result of the violation of his constitutional right to due process, Plaintiff, Meanith Huon, suffered and continues to suffer injuries.

181.    The misconduct that occurred in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff, Meanith Huon's constitutional rights.


## COUNT II
### (False Arrest- 42 U.S.C. § 1983)

1-178. Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, paragraphs 1-178 of this Complaint at Law as and for paragraphs 1-178 of this Count II.

179.    Plaintiff, Meanith Huon , was improperly seized and arrested by Defendants, without legitimate probable cause. Plaintiff, Meanith Huon, was denied liberty without justification in violation of the Constitution.

180.    As a result of the above described wrongful infringement of Plaintiff, Meanith Huon's rights, Plaintiff, Meanith Huon, has suffered damages, including, but not limited to, substantial mental distress and anguish.

181.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Meanith Huon.

.

## COUNT III
### (Malicious Prosecution - State Law Claim)

1-178. Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, paragraphs 1-178 of this Complaint at Law as and for paragraphs 1-178 of this Count III.

179.     Defendants, individually and/or jointly and in conspiracy, initiated and/or continued a malicious prosecution against Mr. Huon, all without probable cause.   Defendants were each instrumental in the initiation and perpetuation of the prosecution of Mr. Huon.   These Defendants each acted with malice.

180.     This prosecution was terminated in Mr. Huon's favor on May 6, 2010 after Mr. Huon had been incarcerated for several days at certain times.

181.     Defendants are liable for malicious prosecution because it was proximately caused by their unlawful actions as set forth above.

182     These actions directly and proximately caused the injuries and damages to Meanith Huon as claimed above, and constitute the tort of malicious prosecution under Illinois law.

183.     Despite having within its possession exculpatory evidence that proved Plaintiff, Meanith Huon's, innocence of the crimes or cast serious doubt as to Plaintiff being guilty of the alleged crime, Defendants caused the prosecution of Plaintiff, Meanith Huon.

184.     Had the concealed exculpatory evidence been considered and evaluated, there would have been no probable cause to proceed against Plaintiff, Meanith Huon, on the charges.

185.     Plaintiff, Meanith Huon, eventually was vindicated of all the alleged crimes.

186.     In prosecuting Plaintiff, Meanith Huon, for the alleged crimes, Defendants acted against Plaintiff, Meanith Huon,   with malice.

187.     The actions of Defendants constitute malicious prosecution of Plaintiff, Meanith Huon, in violation of the laws of the State of Illinois.

188.      As a successor in office and liability to Defendant Mudge, current Madison County State's Attorney, Defendant Gibbons, is liable in his official capacity for the damages caused by the malicious prosecution of Plaintiff, Meanith Huon, by Defendant Mudge and the Madison County State's Attorney's Office.

## COUNT IV

**(Intentional Infliction of Emotional Distress- State Law Claim)**

1-178. Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, paragraphs 1-178 of this Complaint at Law as and for paragraphs 1-178 of this Count IV.

179.    The acts and conduct of Defendants set forth above were extreme and outrageous.   The Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause severe emotional distress to Plaintiff, Meanith Huon

180.    Said actions and conduct did directly and proximately cause severe emotional distress to the Plaintiff, Meanith Huon.

181.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff, Meanith Huon.

182.    As a proximate result of Defendants'   wrongful acts, Plaintiff, Meanith Huon, suffered damages, including severe emotional distress and anguish.

183.    Defendants did intentionally, maliciously, and with reckless disregard and deliberate indifference to Plaintiff's rights, engage in extreme and outrageous conduct in connection with the prosecution of Plaintiff, including but not limited to, engaging in deficient investigations and prosecutions of Plaintiff; proceeding with the prosecutions of Plaintiff without probable cause; and presenting false and misleading argument and evidence to courts and to juries.

184.    The unlawful activities of Defendants were performed for the purpose of ensuring that Plaintiff was arrested, indicted, convicted, and imprisoned so that Defendants could secure a victory in the high-profile crime.

185.    Defendant Mudge did intentionally, maliciously, and with reckless disregard and deliberate indifference to Plaintiff's rights, engage in extreme and outrageous conduct in connection with the prosecution of Plaintiff, including but not limited to, convening a grand jury for improper purposes, which included the deprivation of Plaintiffs rights and the conspiracy to convict him of the crime without due regard to his innocence.

186.    Defendants desired to inflict severe emotional distress on Plaintiff and/or knew that severe emotional distress would be certain or substantially certain to result from their conduct.

187.    As a direct and proximate result of Defendants' extreme and outrageous behavior, Plaintiff suffered severe and emotional distress for which he is entitled to damages.

188.    As a successor in office and liability to Defendant Mudge, current Madison County State's Attorney, Defendant Gibbons, is liable in his official capacity for the damages caused by the intentional and/or reckless infliction of emotional distress by Defendants.

## COUNT V

### (False Imprisonment- State Law Claim)

1-178. Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, paragraphs1-178 of this Complaint at Law as and for paragraphs 1-178 of this Count V.

179.     All Defendants, individually and/or jointly and in conspiracy, falsely imprisoned the Plaintiff Meanith Huon, without probable cause.

180.     All Defendants are liable for this false imprisonment, because it was proximately caused by their unlawful actions as set forth above.

181.     The false imprisonment of Plaintiff, Meanith Huon, was caused by the Defendants.

182.     As a result of the wrongful acts of the Defendants, in falsely imprisoning Plaintiff, Meanith Huon, he has suffered the injuries and damages as set forth above.

.

## COUNT VI

### ( Defamation- State Law Claim)

1-178.   Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, paragraphs 1-178 of this Complaint at Law as and for paragraphs 1-178 of this Count VI.

179.     In causing the arrest and imprisonment of Plaintiff, Meanith Huon, Defendants, Wells and Mudge, made false statements about Plaintiff, Meanith Huon.

180.     Defendants, Mudge and Wells, caused these statements to be widely published in the media.

181.     Defendants made the aforesaid statements with malice, knowing they were false.

182.     The actions of Defendants, Mudge and Wells, in making false statements about Plaintiff, Meanith Huon, and in publishing said statements were a direct and proximate cause of Plaintiff, Meanith Huon's, injuries and damages as more fully set forth in this Complaint.

## COUNT VII

(Claim Under 42 U.S.C. § 1983 Against Defendants Mudge, Hoell, Chapman, and the Madison County State's Attorney's Office)

1-178.   Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, paragraphs 1-178 of this Complaint at Law as and for paragraphs 1-178 of this Count VII.

179.   Defendants Mudge, Hoell, Chapman, and the Madison County State's Attorney's Office charged or indicted   Plaintiff with the alleged crimes of seven(7) felonies: sexual assault (two counts), sexual abuse (three counts), unlawful restraint, harassment of a witness, cyberstalking.

180.   Despite having within their possession exculpatory evidence that proved Plaintiff's innocence of the crimes or cast serious doubt as to Plaintiff's guilt,   Defendants Mudge, Hoell, Chapman, and the Madison County State's Attorney's Office caused the prosecution of Plaintiff for the alleged crimes.

181.   Had the exculpatory evidence been considered and evaluated, there would have been no probable cause to proceed against Plaintiff on the charges.

182.   Plaintiff eventually was vindicated of the alleged crimes.   The Madison County State's Attorney's Office nolle prosequi the two counts of sexual abuse and one count of unlawful restraint before trial.   Mr. Huon was acquitted of the two counts of criminal sexual assault.   On or about the day that Defendant Mudge took the office to become a judge, the Madison County State's Attorney's Office nolle prosequi the charges of harassment of a witness and cyberstalking.

183.   In prosecuting Plaintiff for sexual assault (two counts), sexual abuse (three counts), unlawful restraint, harassment of a witness, cyberstalking, Defendants, Mudge, Hoell, Chapman and the   Madison County State's Attorney's Office acted against Plaintiff with malice.

184.   The actions of Defendants, Mudge, Hoell, Chapman and the   Madison County State's Attorney's Office constitute malicious prosecution in violation of Plaintiff's   rights under the United States Constitution and   42 U.S.C. § 1983.

185.   Defendants, Mudge, Hoell, Chapman and the   Madison County State's Attorney's Office failed to disclose crucial exculpatory evidence to Plaintiff prior to or during the trial.   The concealed exculpatory evidence was material, and the failure to turn over the evidence gave rise to constitutional violations of Plaintiffs rights under Brady v. Maryland, 373 U. S. 83 (1963).

186.   Through his direct actions and decisions as the final and official policymaker for the Madison County State's Attorney's Office, Defendant Mudge   intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiffs rights either participated in the withholding of the exculpatory evidence and/or created and maintained an official policy, practice, and/or custom of ordering and compelling assistant district attorneys of his office to proceed with and maintain the investigation and prosecution of Plaintiff without concern for his constitutional rights.

187.   In addition to or in the alternative, Defendant Mudge acting in his final policymaking

authority and under color of law, created and maintained an official policy, practice, and/or custom of failing adequately to train, monitor and supervise the employees of the Madison County State's Attorney's Office, regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obviousness that such training, monitoring, or supervision was required in order to prevent constitutional violations.

188.    The general practice of withholding exculpatory evidence, even if not authorized by officially adopted or promulgated policy, was so common and well-settled as to constitute an official policy that fairly represented the Madison County State's Attorney's Office's official custom, policy, and/or practice.

189.    Through their direct actions and decisions as final and official policymakers for the Madison County State's Attorney's Attorney's Office, Defendant Mudge intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiff's rights, participated in the withholding of the exculpatory evidence.

190.    Defendants' actions and the official policy, practice, and/or custom   resulted directly in the constitutionally deficient investigation and prosecutions of Plaintiff and abridged his rights guaranteed under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

191.    In this case, the official policy, practice, and/or custom resulted in constitutional <u>Brady</u> violations and led to the deprivation of Plaintiff's fundamental, constitutional rights.

192.     The official policy, practice, and/or custom of concealing exculpatory evidence and maliciously prosecuting individuals, without regard to guilt or innocence, proximately and directly caused Plaintiff injury, including great distress, physical pain, anguish, fear, suffering, loss of companionship, and monetary damages.

193.     As a successor in office and liability to Defendant Mudge, current Madison County State's Attorney, Defendant Gibbons, is liable in his official capacity for the damages caused by the violation of Plaintiffs constitutional rights.

## **COUNT   VIII**

**(Claim Under 42 U.S.C. § 1983 Against Defendants Hertz, Wells, Vucich, Marconi, and the Madison County Sheriff Department)**

1-178.    Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, paragraphs 1-178 of this Complaint at Law as and for paragraphs 1-178 of this Count VIII.

179.    Defendants Hertz, Wells, Vucich, Marconi, and the Madison County Sheriff Department arrested    Plaintiff for the alleged crimes of seven(7) felonies: sexual assault (two counts), sexual abuse (three counts), unlawful restraint, harassment of a witness, cyberstalking.

180.    Despite having within their possession exculpatory evidence that proved Plaintiff's innocence of the crimes or cast serious doubt as to Plaintiff's guilt,   Defendants Hertz, Wells, Vucich, Marconi, and the Madison County Sheriff Department caused the arrest of Plaintiff for the alleged crimes.

181.    Had the exculpatory evidence been considered and evaluated, there would have been no probable cause to proceed against Plaintiff on the charges.

182.    Plaintiff eventually was vindicated of the alleged crimes.   The Madison County State's Attorney's Office nolle prosequi the two counts of sexual abuse and one count of unlawful restraint before trial.   Mr. Huon was acquitted of the two counts of criminal sexual assault.   On or about the day that Defendant Mudge took the office to become a judge, the Madison County State's Attorney's Office nolle prosequi the charges of harassment of a witness and cyberstalking.

183.    In charging Plaintiff for sexual assault (two counts), sexual abuse (three counts), unlawful restraint, harassment of a witness, cyberstalking, Defendants, Hertz, Wells, Vucich, Marconi, and the Madison County Sheriff Department acted against Plaintiff with malice.

184.    The actions of Hertz, Wells, Vucich, Marconi, and the Madison County Sheriff Department constitute false arrest in violation of Plaintiff's   rights under the United States Constitution and   42 U.S.C. § 1983.

185.    Defendants Hertz, Wells, Vucich, Marconi, and the Madison County Sheriff Department failed to disclose crucial exculpatory evidence to Plaintiff prior to or during the trial.   The concealed exculpatory evidence was material, and the failure to turn over the evidence gave rise to constitutional violations of Plaintiffs rights under Brady v. Maryland, 373 U. S. 83 (1963).

186.    Through his direct actions and decisions as the final and official policymaker for the Madison County Sheriff Department, Defendant Hertz   intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiffs rights either participated in the withholding of the exculpatory evidence and/or created and maintained an official policy, practice, and/or custom of ordering and compelling assistant district attorneys of his office to proceed with and maintain the investigation and prosecution of Plaintiff without concern for his constitutional rights.

187.    In addition to or in the alternative, Defendant, Hertz acting in his final policymaking

authority and under color of law, created and maintained an official policy, practice, and/or custom of failing adequately to train, monitor and supervise the employees of the Madison County Sheriff Department, regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obviousness that such training, monitoring, or supervision was required in order to prevent constitutional violations.

188.    The general practice of withholding exculpatory evidence, even if not authorized by officially adopted or promulgated policy, was so common and well-settled as to constitute an official policy that fairly represented the Madison County Sheriff Department's official custom, policy, and/or practice.

189.    Through their direct actions and decisions as final and official policymakers for the Madison County Sheriff Department, Defendant Hertz intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiffs rights, participated in the withholding of the exculpatory evidence.

190.    Defendants' actions and the official policy, practice, and/or custom   resulted directly in the constitutionally deficient investigation and arrest of Plaintiff and abridged his rights guaranteed under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

191.    In this case, the official policy, practice, and/or custom resulted in constitutional <u>Brady</u> violations and led to the deprivation of Plaintiffs fundamental, constitutional rights.

192.     The official policy, practice, and/or custom of concealing exculpatory evidence and falsely arresting individuals, without regard to guilt or innocence, proximately and directly caused Plaintiff injury, including great distress, physical pain, anguish, fear, suffering, loss of companionship, and monetary damages.


## COUNT IX

### (Civil Conspiracy Illinois state law)

1-193.  Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, all above paragraphs for paragraphs 1-178 of Count IX of this Complaint at Law.

194.    Defendants together reached an understanding, engaged in a course of conduct, and otl1erwise jointly acted and/or conspired among and between themselves to falsely arrest and imprison and to intentionally inflict severe emotional distress on Plaintiff, Meanith Huon.

195.    In furtherance of this conspiracy or conspiracies, Defendants,   named above, committed the overt acts set forth above including, but not limited to, the wrongful imprisonment and prosecution of Plaintiff Meanith Huon, of knowingly concealing exculpatory evidence about

Plaintiff Meanith Huon, including but not limited to, the making of knowing misstatements and the presentation of this knowingly false and incomplete evidence to prosecutors and the filing of false and incomplete statements and reports.

196.    Said conspiracy or conspiracies and overt acts were continued from 2008 to the present.

197.    Defendants' acts, as set forth above, in jointly and/or conspiring together to falsely imprison, maliciously prosecute and intentionally inflict emotional and physical distress on Plaintiff, constitute the tort of conspiracy.

199.    This conspiracy proximately caused the injuries to the Plaintiff, Meanith Huon, as set forth above.

## COUNT X

### (Civil Conspiracy Claim Under 42 U.S.C.§ 1985(3))

1-178.  Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, all above paragraphs for paragraphs 1-178 of Count X this Complaint at Law.

179.    Defendants acted in concert and with other individuals, and, conspiring amongst themselves and with others, intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiff's constitutional rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution:

(a)     Withheld exculpatory evidence, and made false arguments to the courts and to juries in order to ensure the conviction, incarceration, and execution of Plaintiff; and

(b)     Imprisoned and continually detained Plaintiff, without probable cause or other legal justification, and on the basis of unlawful arrest;

(c)     Falsely arrested Plaintiff;

(d)     Engaged in retaliatory arrest;

(e)     Engaged in retaliatory prosecution.
180.    In conducting these acts, Defendants were acting pursuant to official policy.

181.     Defendants' conspiracy amongst themselves and with other unnamed individuals proximately and directly caused Plaintiff injury, including great distress, physical pain, anguish, fear, suffering, loss of companionship, and monetary damages.

182.    As a successor in office and liability to Defendant Mudge, current Madison County State's Attorney, Defendant Gibbons, is liable in his official capacity for the damages caused by Defendant Mudge and Defendant Madison County State's Attorney for the conspiracy to deny

Plaintiff his constitutional rights.

.

## COUNT XI

### (745 ILCS 10/9-102- Indemnification)

1-178. Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, all above paragraphs for paragraphs 1-178 of Count XI of this Complaint at Law.

179.    Defendant, Madison County has an obligation to indemnify the Madison County Sheriffs' Department and Sheriffs Deputies for the acts of the Sheriff and individual defendants.   The individual defendants were at all times relevant, employees of the Sheriffs' Department and Defendants Vucich, Marconi, and Wells were apparent or actual agents of the Sheriffs' Department.

180.    Defendant, Madison County, has an obligation to indemnify the Madison County State's Attorney's Office and Assistant State's Attorneys for the acts of the State's Attorney, Assistant State's Attorneys and individual defendants.   The individual defendants were at all times relevant, employees of the State's Attorney's Office Department and Defendants Hoell and Chapman were apparent or actual agents of the State's Attorney's Office.

181.    The individual defendants were at all times relevant acting within the course and scope of their employment.

## COUNT XII

### (745 ILCS 10/9-102- Indemnification)

1-178. Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, all above paragraphs for paragraphs 1-178 of Count XII of this Complaint at Law.

179.    Defendant, City of Chicago has an obligation to indemnify the Chicago Police Department and police officers for the acts of the individual defendant.   The individual defendant at all times relevant, employees of the Chicago Police Department and Defendant McKendry was an apparent or actual agent of the Chicago Police Department.

180.    The individual defendant was at all times relevant acting within the course and scope of his employment.

## COUNT XIII

**(Respondeat Superior- State Law Claim)**

1-178   Plaintiffs, reallege, restate and incorporate by reference, all above paragraphs for paragraphs 1-178 of Count XIII of this Complaint at Law.

179.     In committing the acts above, each of the Defendants were members of and/or agents of, the Office of the Sheriff of Madison County and Madison County acting at all relevant times within the scope of their employment.

180.     Defendants, The Office of the Sheriff of Madison County and Madison County, are liable as a principle for all torts committed by its agents.

## COUNT XIV

**(Respondeat Superior- State Law Claim)**

1-178.  Plaintiffs, reallege, restate and incorporate by reference, all above paragraphs for paragraphs 1-178 of Count XIV of this Complaint at Law.

179.     In committing the acts above, each of the Defendants were members of and/or agents of, the Office of the State's Attorney of Madison County and Madison County acting at all relevant times within the scope of their employment.
180.     Defendants, The Office of the State's of Madison County and Madison County, are liable as a principle for all torts committed by its agents.

## COUNT XV

**(Respondeat Superior- State Law Claim)**

1-178.  Plaintiffs, realleges, restates and incorporates by reference, all above paragraphs for paragraphs 1-178 of Count XV of this Complaint at Law.

179.     In committing the acts above, each of the Defendants were members of and/or agents of, the City of Chicago Police Department and The City of Chicago acting at all relevant times within the scope of their employment.

180.     Defendants, the City of Chicago Police Department and the City of Chicago, are liable as a principle for all torts committed by its agents.

## COUNT XVI
## (Violation of PEN REGISTER ACT, 18 U.S.C.)

1-178.   Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, all above paragraphs for paragraphs 1-178 of Count XVI of this Complaint at Law.

179.   The Pen Register Act specifically requires a "state investigative or law enforcement officer" or "Attorney for the Government" to make an application to the court to obtain an order for the use of a pen register or trap and trace device anywhere in the United States.   18 U.S.C., Chapter 206, Section 3127.   The state investigative or law enforcement officer must certify that the information likely to be obtained by the installation and use of is relevant to an ongoing criminal investigation.   18 U.S.C., Chapter 206, Section 3123.

180.   The Pen Register Act furthers   requires a state investigative or law enforcement officer to maintain a record of the installation and use of the device.   18 U.S.C., Chapter 206, Section 3127.

181.   The Pen Register Act, specifically   makes it illegal for any   person to " install or use a pen register or a trap and trace device without first obtaining a court order under section", 18 U.S.C., Chapter 206, Section 3121.

182.   A pen register is defined as follows:

> (3) the term "pen register" means a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication, but such term does not include any device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider or any device or process used by a provider or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of its business; 18 U.S.C., Chapter 206, Section 3127.

183   A trace device is defined as follows:

> (4) the term "trap and trace device" means a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication;   18 U.S.C., Chapter 206, Section 3127.

184.    The contents of any order entered regarding the use of a pen register and trap and trace device shall provide:

> (A) the identity, if known, of the person to whom is leased or in whose name is listed the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied;

> (B) the identity, if known, of the person who is the subject of the criminal investigation;

> (C) the attributes of the communications to which the order applies, including the number or other identifier and, if known, the location of the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied, and, in the case of an order authorizing installation and use of a trap and trace device under subsection (a)(2), the geographic limits of the order;

>  and

> (D) a statement of the offense to which the information likely to be obtained by the pen register or trap and trace device relates; and . . . 18 U.S.C., Chapter 206, Section 3123.

185.    Even under emergency circumstances, the Pen Register Act requires a state investigative or law enforcement officer specifically designated . . .   by the principal prosecuting attorney of any State or subdivision thereof acting pursuant to a statute of that State", must reasonably determine that:

> (1) an emergency situation exists that involves—

> (A) immediate danger of death or serious bodily injury to any person;

> (B) conspiratorial activities characteristic of organized crime;

> (C) an immediate threat to a national security interest; or

> (D) an ongoing attack on a protected computer (as defined in section 1030) that constitutes a crime punishable by a term of imprisonment greater than one year; that requires the installation and use of a pen register or a trap and trace device before an order authorizing such installation and use can, with due diligence, be obtained, and

> (2) there are grounds upon which an order could be entered under this chapter to authorize such installation and use; may have installed and use a pen register or trap and trace device if, within forty-eight hours after the installation has occurred, or begins to occur, an order approving the installation or use is issued in accordance with section 3123 of this title.      18 U.S.C., Chapter 206, Section

3125.

Thus, an order must be obtained 48 hours within the pen register or trap and trace device is used.

186. "The knowing installation or use by any investigative or law enforcement officer of a pen register or trap and trace device pursuant to subsection (a) [of Chapter 3125] without application for the authorizing order within forty-eight hours of the installation shall constitute a violation of this chapter."   18 U.S.C., Chapter 206, Section 3125 (C).

187. Plaintiff, Meanith Huon did not know, nor did he have any reason to know, that the location of his cell phone was being traced in real time.

188. Plaintiff, Meanith Huon, did not consent to the tracing of his cell phone.

189. Plaintiff, Meanith Huon's, consent cannot be implied from the circumstances of the case.

190.  Law enforcement personnel's request on June 30, 2008 that Sprint PCS "ping" Mr. Huon's cell phone in real time violated the law.

 191.  Defendants Vucich and Madison County Sheriff Department, individually and/or jointly in conspiracy used the tracing device in the aforesaid manner, and thus   violated the law.

192. Plaintiff, Meanith Huon, has been injured as a proximate result of Defendants detectives' and police officer's violation of the law.


## COUNT XVII

### (Violation of CHAPTER 206, THE   STORED WIRE AND ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL RECORDS ACCESS ACT, 18 U.S.C., CHAPTER 121)

1-178.  Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, all above paragraphs for paragraphs 1-178 of Count XVII of this Complaint at Law.

179.  The State must obtain a search warrant establishing probable cause to obtain a court order to disclose information regarding the location of a cell phone.   In re U.S. For an Order Authorizing the Disclosure of Prospective Cell Site Information.   412 F. Supp. 2d 947, affirmed, 2006 WL 2871743 (E.D. Wis. 2006);     In the Matter of the Application of the United States of America for an Order: (1) Authorizing the Installation and use of a Pen Register and Trap and Trap Device; (2) Authorizing the Release of Subscriber and Other Information; and (3) Authoring the Disclosure of Location-Based Services, Case No. 1:06-MC-6 (N. D. Ind. 2006); In the Matter of the Application of the United States for an Order: Authorizing the Installation and

Use of a Pen Register and Trap and Trap Device; (2) Authorizing the Release of Subscriber and Other Information; and (3) Location of Cell Site Origination and/or termination, Case No.: 1:06-MC-7 (N.D. Ind. 2006).

180.    The State must obtain a search warrant establishing probable cause to disclose information regarding the location of a cell sites from where calls originate or terminate.   Id.

181.    The Stored Communications Act expressly prohibit the disclosure of information regarding   "the physical location of the [cell phone] subscriber" by telecommunication carries. 47 U.S.C. Section 1002(a)(2)(B).   In the Matter of the Application of the United States of America for an Order: (1) Authorizing the Installation and use of a Pen Register and Trap and Trap Device; (2) Authorizing the Release of Subscriber and Other Information; and (3) Authoring the Disclosure of Location-Based Services, Case No. 1:06-MC-6 (N. D. Ind. 2006); In the Matter of the Application of the United States for an Order: Authorizing the Installation and Use of a Pen Register and Trap and Trap Device; (2) Authorizing the Release of Subscriber and Other Information; and (3) Location of Cell Site Origination and/or termination, Case No.: 1:06-MC-7 (N.D. Ind. 2006).

182.    The nature of prospective or real-time cell site location data is not a historical record authorized by statute.   In fact, no statute authorizes the collection of cell site location data

183.    The Electronic Communications Privacy Act of 1986 ("ECPA") governs the collection and interception of electronic surveillance.   See Pub. L. No. 99-508, 100 Stat. 1848 (1986). The ECPA contains within its umbrella both historical and prospective cellular records and amended the Wiretap Act to cover electronic communications.   See 18 U.S.C. § 2510.

184.    The search of cellular records, which are historical by nature, is governed by the Stored Communications Act ("SCA").   See 18 U.S.C. § 2701 et seq.   The Pen/Trap Statute governs the collection of prospective data, but the 1994 amendment in the form of the Communications Assistance for Law Enforcement Act ("CALEA") expressly prohibits the provision of information by a cellular phone carrier which would reveal the physical location of a subscriber. See 18 U.S.C. §§ 3121 - 3127 (1986) [Pen/Trap Statute]; and see 47 U.S.C. § 1002 (a)(2) [CALEA].

185.    Statutory authority to gather cell site location information exists only within the Wiretap act, and as such, more than Rule 41 probable cause is required to gather such information. Though debate exists as to whether the electronic signal emitted by a pinged cell phone should be categorized as an electronic communication or a tracking device, the only statute that provides the necessary protection under the Fourth Amendment is the Wiretap Act.

186.    The Wiretap Act is sometimes referred to as requiring a "super-warrant" because the law enforcement must take measures beyond a showing of probable cause in order to secure such a warrant.

187.    Cell site location data is more akin to a wiretap than to a record, prospective or historical,

because the data reveals the location of the individual even in locations entailing the highest expectation of privacy.

188.    Defendants, Vucich and the Madison County Sheriff Department, lacked both Rule 41 probable cause as well as enhanced probable cause required by the Wiretap Act.   Defendants violated the law.

189.    Plaintiff, Meanith Huon did not know, nor did he have any reason to know, that the location of his cell phone was being traced in real time.

190.    Plaintiff, Meanith Huon, did not consent to the tracing of his cell phone.

191.    Plaintiff, Meanith Huon's, consent cannot be implied from the circumstances of the case.

192.    Law enforcement personnel's request on June 30, 2008 that Sprint PCS "ping" Mr. Huon's cell phone in real time violated the law.

192.    Defendant detectives and police officer, individually and/or jointly in conspiracy used the tracing device in the aforesaid manner, and thus   violated the law.

193.    Plaintiff, Meanith Huon, has been injured as a proximate result of Defendants detectives' and police officer's violation of the law.


## COUNT XVIII

**(Violation of The Illinois Electronic Criminal Surveillance Act prohibits the interception of any electronic communication without a court order. 725 ILCS 5/108B.)**

1-178.   Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, all above paragraphs for paragraphs 1-178 of Count XVIII of this Complaint at Law.

179.    The Illinois Electronic Criminal Surveillance Act prohibits the interception of any electronic communication without a court order. 725 ILCS 5/108B.

180.    "Contents" of a communication "includes information obtained from a private communication concerning the existence, substance, purport or meaning of the communication, or the **identity** of a party of the communication" (emphasis supplied).   725 ILCS 5/108B-1(d).

181.    "Electronic communications" means

> means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, or electromagnetic, photo electronic, or photo optical system where the sending and receiving parties intend the electronic communication to be private and the interception, recording, or

transcription of the electronic communication is accomplished by a device in a surreptitious manner contrary to the provisions of this Article.   725 ILCS 5/108B-g(1).

182.    "Electronic criminal surveillance device" "means any device or apparatus, or computer program including an induction coil, that can be used to intercept private communication"    725 ILCS 5/108B-1(h).

183.    A State's Attorney or head of a law enforcement agency may apply in writing to the chief judge of a court of competent jurisdiction for an order authorizing interception of private communications under the following circumstances:

when no party has consented to the interception and (I) the interception may provide evidence of, or may assist in the apprehension of a person who has committed, is committing or is about to commit, a violation of Section 8-1(b) (solicitation of murder), 8-1.2 (solicitation of murder for hire), 9-1 (first degree murder), or 29B-1 (money laundering) of the Criminal Code of 1961, Section 401, 401.1 (controlled substance trafficking), 405, 405.1 (criminal drug conspiracy) or 407 of the Illinois Controlled Substances Act or any Section of the Methamphetamine Control and Community Protection Act, a violation of Section 24-2.1, 24-2.2, 24-3, 24-3.1, 24-3.3, 24-3.4, 24-4, or 24-5 or subsection 24-1(a)(4), 24-1(a)(6), 24-1(a)(7), 24-1(a)(9), 24-1(a)(10), or 24-1©) of the Criminal Code of 1961 or conspiracy to commit money laundering or conspiracy to commit first degree murder; (ii) in response to a clear and present danger of imminent death and great bodily harm to persons resulting from: (1) a kidnapping or the holding of a hostage by force or the threat of the imminent use of force; or (2) the occupation by force or the threat of the imminent use of force of any premises, place, vehicle, vessel or aircraft; (iii) to aid an investigation or prosecution of a civil action brought under the Illinois Streetgang Terrorism Omnibus Prevention Act when there is probable cause to believe the interception of the private communication will provide evidence that a streetgang is committing, has committed, or will commit a second or subsequent gang-related offense or that the interception of the private communication will aid in the collection of a judgment entered under that Act; or (iv) upon information and belief that a streetgang has committed, is committing, or is about to commit a felony.

(b) The State's Attorney or a person designated in writing or by law to act for the State's Attorney and to perform his or her duties during his or her absence or disability, may authorize, in writing, an ex parte application to the chief judge of a circuit court for an order authorizing the interception of a private communication when no party has consented to the interception and the interception may provide evidence of, or may assist in the apprehension of a person who has committed, is committing or is about to commit, a violation of an offense under Article 29D of the Criminal Code of 1961.    725 ILCS 5/108B-2 and B-3.

184.    Each application for a court order to intercept a private communication must show in writing probable cause,   including:

(1) the authority of the applicant to make the   application;

(2) the identity of the electronic criminal   surveillance officer for whom the authority to intercept a private communication is sought;

(3) the facts relied upon by the applicant including:

(I) the identity of the particular person, if   known, who is committing, is about to commit, or has committed the offense and whose private communication is to be intercepted;

(ii) the details as to the particular offense   that has been, is being, or is about to be committed;

(iii) the particular type of private communication to be intercepted;

(iv) except as provided in Section 108B-7.5, a   showing that there is probable cause to believe that the private communication will be communicated on the particular wire or electronic communication facility involved or at the particular place where the oral communication is to be intercepted;

(v) except as provided in Section 108B-7.5, the ]character and location of the particular wire or electronic communication facilities involved or the particular place where the oral communication is to be intercepted;

(vi) the objective of the investigation;

(vii) a statement of the period of time for     which the interception is required to be maintained, and, if the objective of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular statement of facts establishing probable cause to believe that additional communications of the same type will continue to occur;

(viii) a particular statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ;

(4) where the application is for the extension of an   order, a statement of facts showing the results obtained from the interception, or a reasonable explanation of the failure to obtain results;

(5) a statement of the facts concerning all previous applications known to the applicant made to any court for authorization to intercept a private communication

involving any of the same facilities or places specified in the application or involving any person whose communication is to be intercepted, and the action taken by the court on each application;

(6) a proposed order of authorization for consideration by the judge; and

(7) such additional statements of facts in support f the application on which the applicant may rely or as the chief judge may require. 725 ILCS 5/108B-4.

185. An application for an emergency order to intercept a private communication also required a showing of probable cause:

(a) Whenever, upon informal application by the State's Attorney, a chief judge of competent jurisdiction determines that:

(1) there may be grounds upon which an order could   be issued under this Article;

(2) there is probable cause to believe that an   emergency situation exists with respect to the investigation of an offense enumerated in Section 108B-3; and

(3) there is probable cause to believe that a   substantial danger to life or limb exists justifying the authorization for immediate interception of a private communication before formal application for an order could with due diligence be submitted to him and acted upon; the chief judge may grant oral approval for an interception, without an order, conditioned upon the filing with him, within 48 hours, of an application for an order under Section 108B-4 which shall also recite the oral approval under this Section and be retroactive to the time of the oral approval.   725 ILCS 5/108B-8.

186. Defendants, Vucich and the Madison County Sheriff Department, never submitted an application, establishing probable cause.   for court order to intercept a defendant, Meanith Huon's, cell phone.   Therefore, all the evidence were illegally seized and should be suppressed.

187. Plaintiff, Meanith Huon did not know, nor did he have any reason to know, that the location of his cell phone was being traced in real time.

188. Plaintiff, Meanith Huon, did not consent to the tracing of his cell phone.

189. Plaintiff, Meanith Huon's, consent cannot be implied from the circumstances of the case.

190.    Law enforcement personnel's request on June 30, 2008 that Sprint PCS "ping" Mr. Huon's cell phone in real time violated the law.

191.    Defendant detectives and police officer, individually and/or jointly in conspiracy used the tracing device in the aforesaid manner, and thus   violated the law.

192.    Plaintiff, Meanith Huon, has been injured as a proximate result of Defendant detectives' and police officer's violation of the law.


## COUNT XIX

### (Due Process- 42 U.S.C. § 1983 )

1-178.   Plaintiff, Meanith Huon, realleges, restates and incorporates by reference, paragraphs 1-178 of this Complaint at Law as and for paragraphs 1-178 of this Count XIX.

179.    Defendants, while acting under color of law and within the scope of their employment, deprived Plaintiff, Meanith Huon, of his constitutional right to due process, his right to a jury trial, his right to counsel, and his First Amendment rights.

180.    Defendants, Hoell Vucich, the Madison County State's Attorney's Office, and the Madison County Sheriff Department conspired to retaliate against Mr. Huon by falsely arresting him and prosecuting him in 2009, after he demanded jury trial in the 2008 case.

181.    Defendant Hoell repeatedly made false statements to Mr. Huon's prior and subsequent defense counsels in an effort to pressure Mr. Huon to plead guilty, damaging his relationship with his prior defense counsels and leading them to withdraw.

182.    Defendants, Hoell, threatened Mr. Huon with further prosecution if he exercised his First Amendment rights.

183.    Defendants, Wells and Mudge, released statements to the press that were false and defamed Mr. Huon, depriving him the right to an impartial jury untainted by false news reports. Defendants attempted to try this case in the media.

184.    Defendants focused on searching irrelevant information on Mr. Huon's computers located 300 miles from the alleged crime scene that had nothing to do with this case.

185.    Defendants did not focus on the issues in this case, namely, the events at the alleged crime scene.

186.    Each of the Defendants deliberately fabricated false statements and deliberately obstructed justice, thereby causing the false arrest of Plaintiff, Meanith Huon, causing him to be falsely

imprisoned, prosecuted and/or defamed Mr. Huon.

187.    Defendants provided false allegations that were the basis of the criminal complaint and withheld exculpatory evidence.

188..    Absent this misconduct, the arrest and prosecution of Plaintiff, Meanith Huon, could not and would not have been pursued and justice would have not been obstructed .

189.    As a result of the violation of his constitutional right to due process, Plaintiff, Meanith Huon, suffered and continues to suffer injuries.

190.    The misconduct that occurred in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff, Meanith Huon's constitutional rights.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Meanith Huon, requests   the following relief:

1.    An award of compensatory damages   to Plaintiff   and against Defendants,   jointly and severally, in an amount to be determined at trial;

2.    An award of punitive damages   to Plaintiff   and against Defendants,   jointly and severally, in the amount of the current fiscal budget for Madison County of 130,000,000 (One Hundred Thirty Million Dollars) or in an in an amount to be determined at trial.

3.    An order for injunctive relief against   Defendants and their employees from retaliating against Plaintiff;

4.    An award of reasonable costs and attorneys' fees pursuant   to 42 U.S.C. § 1988 or any other applicable law;

5.    An award of costs;

6.    As well as any other relief this Court deems just and appropriate
.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff, Meanith Huon, demands a jury trial on all issues triable.

May 6, 2011

_____/s/Meanith Huon_____

47

Meanith Huon

Meanith Huon
The Huon Law Firm
PO Box 441
Chicago, Illinois 60690
1-312-405-2789
FAX No.: 312-268-7276
ARDC NO:6230996